UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| CHRISTELL SMITH, )<br>)<br>Plaintiff )<br>)<br>vs. )<br>)<br>SAINT MARGARET MERCY, INC., )<br>)<br>Defendant ) | CAUSE NO. 2:06-CV-440 RM |

OPINION AND ORDER

Saint Margaret Mercy Inc. seeks summary judgment on Christell Smith's claims against it. Ms. Smith claims that while she was employed at Saint Margaret Mercy, she was treated in a discriminatory manner and then terminated because of her race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*, and because of her age in violation of 29 U.S.C. § 631(a) of the Age Discrimination in Employment Act of 1967 ("ADEA"). Saint Margaret Mercy also filed a motion for a conference pursuant to Federal Rule of Civil Procedure 16(a) and for a stay of the order concerning pretrial conference and trial pending such conference. For the reasons that follow, the court grants Saint Margaret Mercy's summary judgment motion and denies the motion for a conference and stay as moot.

I. FACTUAL BACKGROUND

The following facts are taken from the summary judgment record and are viewed in the light most favorable to Ms. Smith, the nonmoving party. Ms. Smith is an African-American female born on September 16, 1934. She worked as a certified registered nurse anesthetist ("CRNA"), beginning in the late 1950s. Ms. Smith first performed work at Saint Margaret Mercy through AEP Consultants, which staffed the hospital's anesthesiology department. Saint Margaret Mercy hired Ms. Smith directly on March 10, 2001, when it stopped using an outside staffing agency. Ms. Smith notes that Saint Margaret Mercy chose to retain her even though it did not hire all of the CRNAs who were employed by AEP Consultants.

On February 6, 2004, Ms. Smith entered into a three-year employment agreement with Saint Margaret Mercy to commence on March 1, 2004 and expire on February 28, 2007. The agreement's terms provided that Ms. Smith could be terminated for cause for reasons specified in the agreement or without cause upon at least ninety days written notice. In her deposition, Ms. Smith claimed that she planned to retire from Saint Margaret Mercy on June 30, 2007.

As a CRNA, Ms. Smith provided anesthesia during surgery, during the delivery of babies, and to relieve pain during certain types of medical examinations. Her job requirements included administration of medication, monitoring patient tests and treatment, documentation and preparation of medical records, knowledge of quality standards, and communication with

2

medical staff. While CRNAs work under the general supervision of an anesthesiologist, they are responsible for the provision and monitoring of anesthesia outside the presence of an anesthesiologist. Ms. Smith reported directly to the Medical Director of the Anesthesiology Department, Dr. Ebenezer Tayui, an immigrant from the Republic of Cameroon.

Before her termination, Ms. Smith contends that she was only involved in two performance related incidents. The first incident occurred on December 24, 2005, when she assisted with a surgery for a broken arm. Ms. Smith claims that she took over care from anesthesiologist Dr. Santiago, who left the operating room when she arrived. After the surgical procedure, Ms. Smith decreased the patient's anesthesia and extubated her in preparation for removal to the post-anesthesia care unit ("PACU"). Ms. Smith says that she determined that the patient was at the proper oxygen saturation level before transmitting her to the PACU. Ms. Smith chose not to use a portable pulse oximeter to measure the patient's oxygen saturation level during the transport, which the parties agree is an optional procedure. Saint Margaret Mercy claims Ms. Smith didn't indicate on the anesthesia record that the patient met the criteria for extubation nor did she indicate the time at which oxygen saturation level was measured. Ms. Smith recalls the patient meeting the required criteria and claims that her supervisors never specified that CRNAs should record this information.

Upon arrival at the PACU, the patient's oxygen level had desaturated to 67%, much lower than the ideal level in the high ninetieth percentile. The

3

computer-generated record of the patient's vital signs showed an oxygen saturation level of 56% upon arrival.[1] At her deposition, Ms. Smith confirmed that the patient was saturating in the 60s when she first arrived in the PACU. On the anesthesia record, on the other hand, Ms. Smith indicated that the oxygen saturation level was 97% upon arrival. Ms. Smith maintains that she and the nurse who signed off on the record both read the 97% level off of the machine used in the PACU. Ms. Smith further claims that CRNAs were told simply to fill out the anesthesia record forms and that the instructions provided for entering information were "sketchy at best."

After the PACU incident, nurse Debbie Campbell, the head of the PACU at the hospital's Hammond campus, contacted Dr. Tayui. Following Dr. Tayui's instruction, Nurse Campbell prepared a memorandum documenting her concerns with Ms. Smith's performance. The ensuing December 30 memorandum stated that Ms. Smith didn't properly measure and monitor the patient's oxgenation before her arrival at the PACU. Nurse Campbell also expressed concern that Ms. Smith's documentation didn't reflect the patient's true oxygen saturation levels upon arrival at the PACU.

The second performance related incident occurred shortly thereafter on January 3, 2006, when Ms. Smith assisted Dr. Dumont in a bronchoscopy procedure. Ms. Smith acted as the chief anesthesia practitioner and registered

---

[1] In her response brief, Ms. Smith argues that the computer printout introduced at her deposition had no patient identifying information and, hence, "may or may not be a printout of the patient in question."

nurse Laura Caldwell assisted. Ms. Smith contends that she was reassigned to administer anesthesia for the bronchoscopy at the last minute and discovered that an x-ray was not scheduled but required. Because of the size of the x-ray machine, Ms. Smith says that she decided to leave her anesthesia cart, containing medications and the ambu bag designed to be connected to the anesthesia machine used in crisis situations, in the hallway outside the operating room. She claims she brought some emergency medications and equipment into the room and placed them within reach. Ms. Smith also says she verified that suction and oxygen were available.

During the bronchoscopy, the patient began to desaturate and couldn't maintain a sufficient oxygen saturation level. Dr. Dumont gave Ms. Smith instructions to ventilate the patient using the ambu bag, which she had to retrieve from the hallway and connect to the anesthesia machine. Saint Margaret Mercy notes that the machine wasn't turned on, and Dr. Dumont eventually chose to control the patient's ventilation himself. Ms. Smith acknowledges that she wasn't moving fast enough for Dr. Dumont but claims that she ran into difficulty because the room and machine "were unlike the ones she usually worked with." Ms. Smith then called for the supervising anesthesiologist, Dr. Demidovich, to assist with the rest of the procedure. Upon arrival, Dr. Demidovich noticed that the anesthesia machine wasn't turned on and asked Ms. Smith what types of medications she used to sedate the patient. Ms. Smith told Dr. Demidovich that she used Fentanyl

5

and Versed. Nurse Caldwell added that Ms. Smith had given the patient Dipravin, which caused Ms. Smith to become upset.

Following the bronchoscopy incident, Dr. Dumont contacted Dr. Yayui on January 3 to discuss Ms. Smith's performance. Dr. Tayui says Dr. Dumont claimed that Ms. Smith mismanaged the case, fumbled with her equipment, and was unprepared and disorganized. According to Dr. Tayui, Dr. Dumont was "upset," "irrate," and "appalled" by Ms. Smith's performance. On January 3, Nurse Caldwell prepared an e-mail in which she described Ms. Smith's failure to follow proper procedures as well as her response to Nurse Caldwell's informing Dr. Demidovich that she had given the patient Dipravin. Nurse Caldwell claimed that Ms. Smith didn't have suction properly prepared at the beginning of the procedure and left the ambu bag outside the operating room.

On January 4, Dr. Tayui gave Ms. Smith a letter detailing his conversation with Dr. Dumont and explaining that Dr. Dumont asked not to work with Ms. Smith again. The letter stated that Dr. Dumont had notified hospital administration about her performance and that an investigation was underway. Dr. Tayui asked Ms. Smith to provide a written response regarding the incident. Shortly thereafter, Dr. Tayui met with Nurse Campbell to discuss the PACU incident. After this meeting, Dr. Tayui sent Ms. Smith a second letter regarding Nurse Campbell's complaint and asked Ms. Smith to provide another written response within one week.

Ms. Smith responded to Dr. Tayui's letters on January 12. Regarding the PACU incident, Ms. Smith didn't address the patient's low oxygen saturation level or the documentation discrepancies. Ms. Smith separately addressed the bronchoscopy incident but didn't comment on her alleged performance failures.[2] Upon receiving Ms. Smith's responses, Dr. Tayui suspended her and continued his investigation. In the meantime, Dr. Tayui reviewed the anesthesia records, interviewed Ms. Smith and other staff members, including Nurse Campbell, Nurse Caldwell, and Dr. Demidovich. On February 3, Dr. Demidovich submitted a written report regarding the bronchoscopy incident in which she concluded that the patient was over-sedated and that Ms. Smith wasn't prepared to deal with the case by not turning on the anesthesia machine, not having an ambu bag in the room, and letting the patient's oxygen saturation level drop to 70%.

After investigating, Dr. Tayui sent Ms. Smith a letter on February 8, explaining that he wasn't satisfied with her written responses and that her performance failures were severe. Dr. Tayui stated that Ms. Smith's "management of the above cases [was] far below expectations" and "constitute[d] a clear and present danger to [the] patients." Dr. Tayui also sent his conclusions, including his finding that Ms. Smith couldn't be trusted to work safely without an anesthesiologist in the room, to Saint Margaret Mercy's administration. Saint Margaret Mercy contends that hospital President Thomas Gryzbek decided to

---

[2] At her deposition, Ms. Smith confirmed that she had over-sedated the bronchoscopy patient, causing him to desaturate.

7

terminate Ms. Smith based on this conclusion. Saint Margaret Mercy further maintains that although it had cause to terminate Ms. Smith under the employment contract, it invoked the "without cause" provision in an effort to end their relationship amicably. On February 8, Mr. Gryzbek sent Ms. Smith a letter stating that her employment was terminated effective May 9. Ms. Smith disagrees with Saint Margaret Mercy's conclusions and argues that it discriminated against her on account of her race and age by evaluating and terminating her using different standards than employed for younger and Caucasian co-workers.

## II. DISCUSSION

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). No genuine issue of material fact exists when a rational trier of fact could not find for the nonmoving party even when the record as a whole is viewed in the light most favorable to the nonmoving party. O'Neal v. City of Chicago, 392 F.3d 909, 910-911 (7th Cir. 2004). A nonmoving party cannot rest on mere allegations or denials to overcome a motion for summary judgment; "instead, the nonmovant must present definite,

competent evidence in rebuttal." Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004). The nonmoving party must point to enough evidence to show the existence of each element of its case on which it will bear the burden at trial. Celotex v. Catrett, 477 U.S. 317, 322-323 (1986); Lawrence v. Kenosha Cty., 391 F.3d 837, 842 (7th Cir. 2004).

Ms. Smith claims Saint Margaret Mercy discriminated against her based on her race and age and terminated her as a result of such discrimination. Title VII prohibits employers from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). The Age Discrimination in Employment Act makes it "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

Ms. Smith has two means of proving her discriminations claims: (1) by presenting evidence under the direct method of proof that her age and/or race were determinative in Saint Margaret Mercy's decision to terminate her; or (2) by employing the indirect, burden-shifting method of proof. *See* Raymond v. Ameritech Corp., 442 F.3d 600, 610 (7th Cir. 2006); Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000). Ms. Smith must show that discriminatory animus " actually played a role in the employer's decisionmaking

9

process and had a determinative influence on the outcome." *See* Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000) (citation omitted).

To succeed under the direct method, Ms. Smith must present evidence sufficient to point directly to a discriminatory reason for her termination. Ptasznik v. St. Joesph's Hosp., 464 F.3d 691, 695 (7th Cir. 2006); *see also* Radue v. Kimberly-Clark Corp., 219 F.3d 612, 616 (7th Cir. 2000) (noting that to establish a prima facie case under the direct method, the plaintiff must show that he wouldn't have been terminated but for his race). Ms. Smith offers neither an acknowledgment of discriminatory intent on the part of Saint Margaret Mercy nor circumstantial evidence that could provide the basis for an inference of discrimination. Accordingly, Ms. Smith must proceed under the indirect method of proof. *See* Gorence v. Eagle Food Ctrs., Inc., 242 F.3d 759, 762 (7th Cir. 2001).

Ms. Smith may establish a prima facie case of discrimination under the indirect method by demonstrating that: (1) she is a member of a protected class; (2) she was meeting Saint Margaret Mercy's legitimate expectations; (3) she suffered an adverse employment action; and (4) Saint Margaret Mercy treated other similarly situated employees who were not members of the class more favorably. Goodwin v. Bd. of Trs. of Univ. of Ill., 442 F.3d 611, 617 (7th Cir. 2006); *see also* Krchnavy v. Limagrain Genetics Corp., 294 F.3d 871, 875 (7th Cir. 2002) (holding that the indirect burden-shifting method applies to both Title VII and ADEA claims). Upon such a showing, the burden shifts to Saint Margaret Mercy to articulate a legitimate nondiscriminatory reason for Ms. Smith's termination.

Herron v. DaimlerChrysler Corp., 388 F.3d 293, 299 (7th Cir. 2004). If Saint Margaret Mercy points to such a reason, Ms. Smith bears the ultimate burden to show that Saint Margaret Mercy's proffered reason is a pretext for racial and/or age-based discrimination. Id.

Saint Margaret Mercy acknowledges that Ms. Smith is a member of two protected classes, based on her race and age, and doesn't dispute that her termination constitutes an adverse employment action. In deciding whether Ms. Smith has established a prima facie case of discrimination, the court need only consider whether Ms. Smith was performing up to Saint Margaret Mercy's legitimate expectations and whether she can point to any similarly situated employee who was treated more favorably.

Saint Margaret Mercy argues that both the PACU and bronchoscopy incidents were sufficiently severe to find that Ms. Smith wasn't performing her job satisfactorily. Ms. Smith responds by pointing out that she had been working as a CRNA at the Saint Margaret Mercy facility her entire career and had been chosen as a permanent employee in 2001, evidencing her qualifications for the position. Despite those qualifications, Ms. Smith hasn't raised genuine issues of material fact as to whether she was performing up to Saint Margaret Mercy's legitimate expectations. For example, Ms. Smith claims that the patient's condition didn't warrant use of a portable oximeter during the PACU incident. She also says that the anesthesia records forms didn't provide a place for her to indicate that she had taken over for another anesthetist, but she nevertheless

11

received criticism for the absence of this information. Saint Margaret Mercy doesn't rely exclusively on either of these issues to demonstrate that Ms. Smith wasn't meeting its expectations. Instead, Saint Margaret Mercy concluded that Ms. Smith didn't properly measure and monitor the patient's oxgenation before her arrival at the PACU, regardless of the use of the optional oximeter, and that the supporting documentation didn't reflect the patient's true oxygen saturation levels. Ms. Smith hasn't produced evidence to refute these claims.

Ms. Smith claims she followed hospital custom as well as orders from the attending physician during the bronchoscopy incident. It is undisputed, however, that Ms. Smith didn't have immediate access to the anesthesia cart and the ambu bag during the procedure. She also admitted at her deposition that she wasn't moving quickly enough for Dr. Dumont and that she was responsible for over-sedating the patient. Ms. Smith further confirmed that Dr. Tayui had reason to be concerned about her performance. Ms. Smith doesn't dispute receiving warnings about the incidents, and her evaluations of her own ability are not enough, standing alone, to dispute Saint Margaret Mercy's contrary conclusions. Gustovich v. AT&T Comm'ns, Inc., 972 F.2d 845, 848 (7th Cir. 1992). Accordingly, Ms. Smith hasn't shown that she was meeting Saint Margaret Mercy's legitimate expectations.

Assuming Ms. Smith could establish that she was performing satisfactorily, she must also point to a similarly situated employee who received more favorable treatment but was not a member of one of the protected classes. *See* Radue v.

12

Kimberly-Clark Corp., 219 F.3d at 617-618 (holding that "in disciplinary cases - in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason - a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct."). To prove an individual is similarly situated, Ms. Smith must point to an employee who is "directly comparable in all material respects." Grayson v. O'Neill, 308 F.3d 808, 819 (7th Cir. 2002). Specifically, Ms. Smith must demonstrate that another employee "occupied the same job level and engaged in similar past misconduct, but as a result of [the] misconduct [the employee] was treated differently (*i.e.*, more favorably) for no legitimate reason." Jordan v. City of Gary, 396 F.3d 825, 834 (7th Cir. 2005).

Ms. Smith hasn't met this burden. First, she points to Loretta Beier, a younger, Caucasian female, who was written up but not terminated for an incident in which she had to provide a written response to Dr. Tayui. Unlike the incidents involving Ms. Smith, Dr. Tayui and the attending physician actually commended Ms. Beier for her efforts during the incident, although Dr. Tayui suggested that Ms. Beier should have insisted that the physician not begin the procedure until the patient's oxygen saturation levels stabilized. Moreover, Ms. Beier received only one letter from Dr. Tayui, while Ms. Smith received two, for incidents occurring only ten days apart and considered qualitatively more problematic than the single incident involving Ms. Beier. As such, Ms. Beier cannot be considered a similarly situated person.

Ms. Smith also claims that Ms. Beier recounted an incident involving a male CRNA who could've been written up by the intensive care nurses but received no warning. Like Ms. Beier, the male CRNA did not engage in conduct comparable to Ms. Smith's two serious performance incidents. Further, Ms. Smith provides no information regarding the male CRNA's race or age, so she hasn't come forth with evidence from which a reasonable trier of fact could find that similarly situated employees outside the protected classes received better treatment.

Even if Ms. Smith could establish a prima facie case, Saint Margaret Mercy produced sufficient evidence to support its nondiscriminatory reason for its termination decision. Saint Margaret Mercy claims that it fired Ms. Smith because of the two performance incidents that led Dr. Tayui to conclude that she couldn't be trusted to safely treat patients according to the hospital's established business model. Because Saint Margaret Mercy has come forth with a legitimate nondiscriminatory reason for firing Ms. Smith, the court will examine whether Ms. Smith has demonstrated that Saint Margaret Mercy's proffered reason is a pretext for discrimination. *See* United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant.").

To show pretext, Ms. Smith must demonstrate that Saint Margaret Mercy gave a dishonest explanation for its actions. *See* Kulumani v. Blue Cross Blue Shield Ass'n, 224 F.3d 681, 684 (7th Cir. 2000) (pretext "means something worse

14

than a business error; pretext means deceit used to cover one's tracks."). If Saint Margaret Mercy's decision to terminate Ms. Smith was in good faith, the court can't second-guess the termination decision regardless of whether or not the court believes those actions were correct. *See* Jackson v. E.J. Brach Corp., 176 F.3d 971, 983 (7th Cir. 1999) (holding that so long as the employer honestly believes in the proferred reason for its action, then there is no pretext "even if the reasons are foolish or trivial or even baseless."). Courts cannot impose on employers their own ideas of what constitutes a prudent business decision; they "can assess only the question [of] whether an employer has taken an action for a forbidden reason." Leonberger v. Martin Marietta Materials, Inc., 231 F.3d 396, 399 (7th Cir. 2000).

Ms. Smith hasn't produced evidence that could lead a reasonable trier of fact to find that Saint Margaret Mercy's reason for terminating her was a pretext for race discrimination or age discrimination. Saint Margaret Mercy found Ms. Smith to be a danger to its patients. Regardless of whether this assessment was correct, Ms. Smith hasn't shown that this reason had no basis in fact or that Dr. Tayui's conclusions were actually a cover-up for unlawful discrimination. *See* Balderston v. Fairbanks Morse Engine Div. of Coltec Indus., 328 F.3d 309, 323 (7th Cir. 2003) ("To show that an employer's proffered reason is pretextual, a plaintiff must do more than demonstrate that the employer made a mistake or that the employer's reason was not good enough to support its decision."). Ms. Smith instead argues pretext based on having been a CRNA for many years and that the absence of serious injuries or death from the two performance incidents.

15

This evidence can't show that Dr. Tayui didn't honestly believe in the reasons that led him to conclude that Ms. Smith's performance was unsatisfactory.

Saint Margaret Mercy presents two additional arguments against pretext. First, Ms. Smith was already 66 years old when she was hired. As such, Saint Margaret Mercy suggests that it would be illogical to believe that it would hire Ms. Smith when she was already a member of the age protected class and then fire her because of her age. *See* Ritter v. Hill 'N Dale Farm, Inc., 231 F.3d 1039, 1044 (7th Cir. 2000). Ms. Smith points out that this reasoning fails because Dr. Tayui didn't take part in the decision to hire Ms. Smith but was very much involved in the termination process. Saint Margaret Mercy also states that Dr. Tayui is the same race as Ms. Smith, undermining the argument that Dr. Tayui discriminated against her because of her race. *See* St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 508 (1993). Ms. Smith claims that this reasoning doesn't apply because she is African-American, while Dr. Tayui is an immigrant from the Republic of Cameroon. Neither of these arguments are of consequence because Ms. Smith hasn't presented evidence that tends to show that Dr. Tayui didn't act in good faith by recommending her termination for poor performance.

Ms. Smith hasn't presented sufficient evidence of discriminatory motivation to create a genuine issue of fact for trial. Accordingly, Ms. Smith hasn't carried her burden on either her Title VII or her ADEA claims, and Saint Margaret Mercy is entitled to summary judgment.

III. CONCLUSION

For the foregoing reasons, the court GRANTS Saint Margaret Mercy's motion for summary judgment [Doc. No. 23] and DENIES the motion for a conference and stay [Doc. No. 33] as moot. The clerk shall enter judgment accordingly.

SO ORDERED.

ENTERED: March 10, 2008

                            /s/ Robert L. Miller, Jr.
                            Chief Judge
                            United States District Court